IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Criminal No. 25-289 |
| v. | ) | Hon. Marilyn J. Horan |
| | ) | United States District Judge |
| BRETT MICHAEL DADIG | ) | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

AND NOW comes the United States of America by its attorneys, Troy Rivetti, United States Attorney for the Western District of Pennsylvania, and Hillary M. Weaver, Assistant United States Attorney for said District, and respectfully files the within Sentencing Memorandum.

## I. Introduction

From May to November 2025, the Defendant relentlessly harassed, stalked, and threatened numerous women. These women included romantic interests, business owners, and even a nurse who treated the Defendant in a hospital. Not only did the Defendant commit these crimes, but he also broadcast his disturbing conduct on his podcast and social media accounts. There, he mentioned many of these women by name, posted photographs of them, and shared private communications he had with them. While the Defendant's conduct was upending the victims' lives, the Defendant boasted on social media about the popularity of his social media "content" and his growing audience.

The Defendant perpetrated many of his crimes from his phone and computer, insulating him from the real, life-altering impact of his crimes on the victims. As the Defendant's conduct escalated, some victims contacted their local police departments, some obtained Protection from Abuse ("PFA") orders, and some changed their work schedules and daily routines. The Defendant, however, remained undeterred; none of these measures, including court orders, stopped his

conduct. It was only when the Defendant was incarcerated on a federal arrest warrant in this case that the Defendant's criminal conduct finally ceased.

The Defendant now comes before this Court, having been convicted of committing the following offenses: four counts of Cyberstalking, in violation of 18 U.S.C. §§ 2261A(2)(A) and (B) (Counts One, Two, Three, and Four), six counts of Interstate Stalking, in violation of 18 U.S.C. §§ 2261A(1)(A) and (B) (Counts Six through Eleven), and one count of Interstate Threats, in violation of 18 U.S.C. § 875(c) (Count Fourteen).

By statute, the violations at 18 U.S.C. §§ 2261A(2)(A) and (B) (Counts One through Four and Six through Eleven) carry a maximum sentence of 60 months of incarceration. Counts One and Three carry a mandatory minimum sentence of one year imprisonment because the Defendant committed the offenses in violation of two separate Protection from Abuse orders. *See* 18 U.S.C. § 2261A(6). The violation at 18 U.S.C. § 875(c) (Count Fourteen) carries a maximum sentence of 60 months of incarceration. With the Defendant's final offense level of 22 and his criminal history category of I, the applicable guidelines range is 41 to 51 months of imprisonment. *See* Presentence Investigation Report ("PSIR") ¶ 140.

This Court has the authority to impose a term of imprisonment at each of the eleven (11) counts and may run the terms of imprisonment consecutively or concurrently. *See* 18 U.S.C. § 3584(a); *see also United States v. Chase*, 296 F.3d 247, 250 (4th Cir. 2002) ("grouping does not preclude the imposition of consecutive sentences under § 5G1.2"). Additionally, the Court may impose a period of three (3) years of supervised release to follow any term of imprisonment. PSIR ¶¶ 142, 145. Multiple terms of supervised release must run concurrently. PSIR ¶ 143.

The Defendant's crimes in this case are serious and have had a profound, lasting impact on the victims. A substantial upward variance from the advisory guidelines is appropriate and necessary upon consideration of the sentencing factors set forth in 18 U.S.C. § 3553. The Court may accomplish this by varying upward from the 41 to 51 months range or by imposing guidelines-range sentences at multiple counts consecutively.

## II. Section 3553(a) Factors

Pursuant to 18 U.S.C. § 3553(a), this Court must impose a sentence that is "sufficient, but not greater than necessary" after considering the following sentencing factors: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense.

Consideration of these factors compels a significant period of incarceration followed by a term of supervised release. The Government offers its position as to each factor below.

### *1. 18 U.S.C. § 3553(a)(1) – The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant.*

The nature and circumstances of the offense and the history and characteristics of the Defendant both weigh in favor of the Government's request for a substantial upward variance. The offenses involved the ongoing, persistent harassment and stalking of eleven (11) different victims.

Each victim suffered separate and distinct harm from the Defendant's conduct. The gravity of these offenses is aggravated by the fact that the Defendant escalated his behavior whenever the victims stopped communicating with him or sought protection from him. The offenses are further aggravated by the significant impact the Defendant's crimes have had on the victims in this case. The history and characteristics of the Defendant also support the Government's position, as described more fully below.

a. <u>The Defendant's crimes of stalking, harassing, and threating women – and documenting his conduct on public platforms – are serious.</u>

The nature and circumstances of the offenses are serious and had a significant impact on the victims and their families. Cyberstalking crimes have drastically increased in recent years. The below statistics from the Federal Bureau of Investigation show that cyber harassment and stalking complaints have increased approximately 84% from 2024 to 2025.

**IC3 Complaints in 2025**

**Three Year Complaint Count Comparison**

**By Complaint Count**

| Crime Type | 2025 | 2024 | 2023 |
|---|---|---|---|
| Advanced Fee | 7,762 | 7,097 | 8,045 |
| BEC | 24,768 | 21,442 | 21,489 |
| Botnet | 715 | 587 | 540 |
| Charity | 662 | * | * |
| Confidence/Romance | 23,159 | 17,910 | 17,823 |
| Credit Card/Check Fraud | 18,774 | 12,876 | 13,718 |
| Crimes Against Children | * | 4,472 | 2,361 |
| Data Breach | 3,963 | 3,204 | 3,727 |
| Employment | 24,688 | 20,044 | 15,443 |
| Extortion | 89,129 | 86,415 | 48,223 |
| Government Impersonation | 32,424 | 17,367 | 14,190 |
| Harassment/Stalking | 21,557 | 11,672 | 9,587 |

Federal Bureau of Investigation, *Internet Crime Report 2025*, at 25 (2026), https://www.fbi.gov/

file-repository/2025_ic3report.pdf/view (emphasis added); *see also* Joanne D. Worsley, et al., *Victims' Voices: Understanding the Emotional Impact of Cyberstalking and Individuals' Coping Responses*, SAGE OPEN, at 1 (2017) ("Ubiquitous access to the Internet has dramatically altered communication in contemporary society, and these electronic means provide perpetrators with novel ways of pursuing individuals.").

"Cyberstalking represents a violation of the fundamental human rights to life, liberty, and security, and can amount to a very significant interference with the victims' privacy, family, or property." Ioana Vasiu & Lucian Vasiu, *Light My Fire: A Roentgenogram of Cyberstalking Cases*, 40 AM. J. TRIAL ADVOC. 41, 44 (2016). Courts in the United States, including the Third Circuit Court of Appeals, have acknowledged the seriousness of these offenses as they have become more commonplace. *See United States v. Yung*, 37 F.4th 70, 83 (3d Cir. 2022) ("Cyberstalking is a serious crime that calls for serious punishment."); *United States v. Waggy*, 936 F.3d 1014, 1020 (9th Cir. 2019) (cyberstalking statute "targets conduct performed with serious criminal intent"); *United States v. Sayer*, 748 F.3d 425, 435 (1st Cir. 2014) (same); *United States v. Khoundara*, No. CR 22-00061, 2024 WL 4490487, at *5 (D. Haw. June 28, 2024) (defendant's cyberstalking and harassment of a victim fell "squarely into the category of being a serious crime"); *United States v. Hollingberry*, No. CR20-00673-001, 2021 WL 3912850, at *1 (D. Ariz. Sept. 1, 2021) (cyberstalking is a "crime of violence" and there is a "serious risk" that defendants will continue to "weaponize the internet" to threaten or intimidate their victims).

The nature and circumstances of Defendant's offenses are reflected in the recitation of the offense conduct within the PSIR and the chronology detailed in the Indictment returned against the Defendant. *See* PSIR ¶¶ 16-29; ECF 22. For a period of seven months, the Defendant stalked, harassed, threatened, and intimidated eleven (11) different female victims, many of whom the

Defendant had an unreciprocated romantic interest in. PSIR ¶¶ 16-29; ECF 22. The Defendant's conduct included incessant online posts about the victims, visits to the victims' places of employment (even after he had been banned from the establishments), sending disparaging and harassing text messages to the victims, and even becoming fixated on the minor child of one of the victims. PSIR ¶¶ 18-28. The Defendant threatened many of these victims, particularly after they indicated they did not want to communicate with the Defendant or sought protection from the Defendant. The Defendant's conduct includes, but is not limited to, the following behaviors:

- <u>Person 1</u> – The Defendant began to harass and stalk Person 1 after she indicated she no longer wished to communicate with him. ECF 22 ¶¶ 19-34; PSIR ¶ 18. Defendant engaged in the following conduct over the course of approximately three months: (1) sending Person 1 an unsolicited nude photo of himself (ECF 22 ¶ 21); (2) threatening to post about Person 1 on social media if she did not respond to his text messages (ECF 22 ¶ 22); (3) contacting Person 1's employer and saying Person 1 should not be employed there (ECF 22 ¶ 23; PSIR ¶ 18); (4) calling Person 1's employer repeatedly from different phone numbers (ECF 22 ¶ 24; PSIR ¶ 18); (5) posting Person 1's name and photograph online and requesting that others contact her (ECF 22 ¶ 25); (6) making a podcast about Person 1 after he had been served a PFA order obtained by Person 1 (ECF 22 ¶¶ 27, 28; PSIR ¶ 18); (7) calling Person 1 a "cunt" and "garbage" on the podcast (ECF 22 ¶ 28); (7) making the following threat against Person 1 on the podcast: "[Y]ou want to fuck with me . . . come fuck with me . . . I promise you, you will regret it . . . see what fucking happens to you; it ain't going to be pretty for you." (ECF 22 ¶ 28; PSIR ¶ 18); (8) making a second podcast about Person 1 after he had been arrested for violating the PFA (ECF 22 ¶ 32); and (8) and traveling to Person 1's place of employment and violating the PFA for a second time (ECF 22 ¶ 33; PSIR ¶ 18).

- <u>Person 2</u>: The Defendant began to stalk and threaten Person 2 after Person 2 had him banned from her yoga studio because of his behavior with female clients. ECF 22 ¶¶ 36-43; PSIR ¶ 19. Defendant engaged in the following conduct over the course of approximately four months: (1) traveling to Person 2's business after police informed him he could not be on the property (ECF 22 ¶¶ 36-38; PSIR ¶ 19); (2) standing outside of Person 2's business and threatening to sue her (ECF 22 ¶ 38; PSIR ¶ 19); (3) posting Person 2's name

and photograph on social media and requesting that others contact her (ECF 22 ¶ 39); (4) posting threats against Person 2 on social media, including the following: "You can ban me from the mall, but you can't ban me from coming after everything you worked so hard to build," "You deserve everything that is coming to you," and "Mall security can't save you when judgment day comes." (ECF 22 ¶ 38(b)-(d); PSIR ¶ 19).

- Person 3: The Defendant began to stalk and threaten Person 3 after she decided not to pursue a romantic relationship with him. ECF 22 ¶¶ 44-56. Defendant engaged in the following conduct over the course of approximately three months: (1) attending an event also attended by Person 3 and yelling at her and berating her (ECF 22 ¶ 46); (2) sending Person 3 harassing and disparaging text messages (ECF 22 ¶ 47; PSIR ¶ 20); (3) posting the Defendant's communications with Person 3 on social media with additional disparaging remarks about Person 3 (ECF 22 ¶ 47; PSIR ¶ 20); (4) making a podcast about Person 3 where he identifies Person 3 by her full name and blames her for "ruining [the Defendant's] entire life" (ECF 22 ¶ 48); (5) making a second podcast about the Person 3 where he called her a "cunt" and stated she would "rot in motherfucking hell" (ECF 22 ¶ 49); (6) posting Person 3's LinkedIn page on social media with remarks about her "liv[ing] off her grandpa," and stating Person 3 was an "old fucking bag that's gonna die alone" (ECF 22 ¶ 51); (7) making a third podcast about Person 3, which included Person 3's name in the title of the podcast (ECF 22 ¶ 51); (8) discussing where Person 3 lived and making disparaging remarks about her career and appearance in the podcast (ECF 22 ¶¶ 51-52); (9) making the following threat in the podcast:

  > "You better fucking pray I don't find you. You better pray 'cause you would never say this shit to my face. Cause if you did, your jaw would be motherfucking broken. And then you, then you wouldn't be able to yap, then you wouldn't be able to fucking, I'll break, I'll break every motherfucking finger on both hands. Type the hate message with your fucking toes, bitch." ECF 22 ¶ 52(b); PSIR ¶ 20.

  and (10) violating a PFA obtained by Person 3 by posting one of the podcasts referencing Person 3 (ECF 22 ¶ 55; PSIR ¶ 20).

- Person 4 - The Defendant began to stalk and harass Person 4 after the two had worked together. ECF 22 ¶¶ 57-66. Defendant engaged in the following conduct

over the course of approximately four months: (1) disparaging Person 4 to Person 4's professional colleague, including referring to Person 4 as a "bitch" and a "cunt" (ECF 22 ¶ 58); (2) calling Person 4 and yelling at her after the Defendant was fired (ECF 22 ¶ 59); (3) talking about Person 4 on his podcast, where he referred to her as a "bitch," "fake," and "racist," and telling listeners he would share Person 4's name if they messaged him (ECF 22 ¶ 60); (4) in the same podcast where he discussed Person 4, stating, "You better start praying. You better change your ways because . . . it's reckoning hour." (ECF 22 ¶ 62; PSIR ¶ 21); (5) sending a link to the podcast to Person 4's colleague (ECF 22 ¶ 63; PSIR ¶ 21); and (5) posting on social media that the Defendant was staying in a hotel in Florida less than one mile from Person 4's corporate office (ECF 22 ¶ 65).

- Person 5 - The Defendant began to stalk and harass Person 5 after he met Person 5 as she walked home from work. ECF 22 ¶¶ 67-73. Defendant engaged in the following conduct over the course of approximately one week: (1) following Person 5 to her car and subjecting her to unwanted sexual touching (ECF 22 ¶ 68; PSIR ¶ 22); (2) taking photographs and videos of Person 5 and posting about her on social media without her consent (ECF 22 ¶ 69; PSIR ¶ 22); (3) texting Person 5, "I know where you work." (ECF 22 ¶ 70; PSIR ¶ 22); (4) posting about Person 5 and her siblings on social media after Person 5's siblings asked the Defendant to leave Person 5 alone (ECF 22 ¶ 71); (5) discussing Person 5 using her full name on a podcast (ECF 22 ¶ 72; PSIR ¶ 22); and (6) calling Person 5 a "bitch" and "cunt" in the podcast and stating she would "rot in motherfucking hell." (ECF 22 ¶ 72).

- Person 6 and Person 7 - The Defendant began to stalk and harass Person 6 and Person 7 after he visited a gym where Person 6 worked as a new employee and Person 7 was a manager. ECF 22 ¶¶ 74-82. Defendant engaged in the following conduct over the course of approximately two days: (1) following Person 6 as she walked home and stated he wanted to have children with Person 6 (ECF 22 ¶ 75; PSIR ¶ 23); (2) attempting to approach Person 6 again the next day, prompting Person 6 to notify campus security (ECF 22 ¶ 76; PSIR ¶ 23); (3) posting about Person 6 online after she reported the Defendant to campus security (PSIR ¶ 23); (4) calling Person 7 after Person 7 had banned the Defendant from Person 7's gym, stating he would "burn [Person 7's] business to the fucking ground" (ECF 22 ¶ 79; PSIR ¶ 24); (5) attempting to harass Person 7 and her employees on social media (ECF 22 ¶ 80); and (6) discussing Person 7 in a podcast episode (ECF 22 ¶ 81; PSIR ¶ 24).

- Person 8 - The Defendant began to stalk and harass Person 8 after claiming Person 8 "stood him up for an event." ECF 22 ¶¶ 83-91. Defendant engaged in the following conduct over the course of several weeks: (1) making inappropriate sexual comments towards Person 8 (ECF 22 ¶ 84); (2) sending Person 8 a message stating Person 8 "better pray [Person 8 and the Defendant] don't run into each other next time [the Defendant was] in NYC. [Person 8] better have [her] therapist on speed dial." (ECF 22 ¶ 86; PSIR ¶ 25); (3) calling Person 8's employer complaining about Person 8 (ECF 22 ¶ 87; PSIR ¶ 25); (4) posting a podcast about Person 8 where he called her a "sack of shit" and "piece of garbage" (ECF 22 ¶ 89; PSIR ¶ 25); and (5) sending Person 8 a link to the podcast in which he disparaged her (PSIR ¶ 25).

- Person 9 - The Defendant began to stalk and harass Person 9, a nurse, after Person 9 treated the Defendant in the hospital. ECF 22 ¶¶ 92-97; PSIR ¶ 26. Defendant engaged in the following conduct over the course the day he interacted with Person 9: (1) repeatedly asking for Person 9's phone number and home address, prompting Person 9 to hide from Defendant in the breakroom (ECF 22 ¶¶ 93-94; PSIR ¶ 26); (2) taking multiple photographs of Person 9 without her consent (ECF 22 ¶ 95; PSIR ¶ 26); (3) posting the photographs of Person 9 on his social media accounts, which included Person 9's first name and the location of her workplace (ECF 22 ¶ 95; PSIR ¶ 26); and (4) referring to Person 9 as his "wife" in the social media posts, and stating, "I see your body in a white [dress]." (ECF 22 ¶ 96; PSIR ¶ 26). The hospital had to increase security measures after Person 9's interaction with the Defendant. (ECF 22 ¶ 97).

- Person 10 - The Defendant began to stalk and harass Person 10 after he met Person 10 at a yoga class. ECF 22 ¶¶ 98-101; PSIR ¶ 28. The Defendant engaged in the following conduct over the course of one month: (1) posting messages between the Defendant and Person 10 where Person 10 stated that she felt physically threatened by the Defendant during an in-person interaction (ECF 22 ¶ 99; PSIR ¶ 28); (2) captioning the post with the following threat: "Ya'll wanna see a dead body?" (ECF 22 ¶ 100; PSIR ¶ 28); and (3) posting a podcast about Person 10, where he states her full name and describes their interactions (ECF 22 ¶ 101).

- Person 11 - The Defendant began to stalk and harass Person 11 after he met her online. ECF 22 ¶¶ 102-109; PSIR ¶ 27. Defendant engaged in the following

> conduct over the course of of several days: (1) posting Person 11 and her minor daughter's first names on social media after Person 11 had asked the Defendant not to post anything about her daughter (ECF 22 ¶ 104; PSIR ¶ 27); (2) messaging Person 11 stating he was "obsessed with her daughter" and was "turning [himself] on thinking about making babies with [Person 11]" (ECF 22 ¶ 105); (3) traveling from Pittsburgh to Person 11's residence in Ohio, even though Person 11 had never given the Defendant her home address (ECF 22 ¶ 106; PSIR ¶ 27); (4) refusing to leave Person 11's residence until she took a photograph with him (ECF 22 ¶ 106); (5) traveling to Person 11's house for a second time the day after his first visit, at which point Person 11 refused to come outside and had her neighbors ask the Defendant to leave (ECF 22 ¶ 107; PSIR ¶ 27); and (6) posting a podcast about Person 11 where he referred to Person 11's daughter as "[his] daughter." (ECF 11 ¶ 108; PSIR ¶ 27).

This conduct understandably "placed [the] victims in reasonable fear of death or serious bodily injury or caused substantial emotional distress to [the] victims." PSIR ¶ 29. In many cases, cyberstalking results in the very outcome feared by the victims – violence. *See* Worsley, *supra*, at 1 ("it is common for cyberstalking to begin with the issuing of threats, and escalate to physical assault"); Vasiu & Vasiu, *supra*, at 44 (cyberstalking cases "present the real risk of physical violence and even homicide").

The Defendant's conduct is even more troubling because of the public manner in which he documented it. Not only were the victims enduring unwanted communications from the Defendant, but they were also subjected to the Defendant's efforts to publicly humiliate the victims on various social media platforms. Many of the Defendant's social media posts included "screenshots" of his text messages with the victims, photographs of the victims, and in some cases, the name and location of their employers. These posts were often "captioned" or accompanied by derogatory remarks about the victims. On multiple occasions, when a victim would try to "block" the Defendant or otherwise indicate the victim no longer wanted to have contact with the Defendant,

he would post the victim's contact information and encourage others to contact the victim on his behalf.

The Defendant also disparaged the victims, and women in general, on his podcast. The Defendant referred to women using multiple derogatory terms, including "bitches," "cunts," and "sluts." For example, in a podcast posted on September 21, 2025, the Defendant stated the following:

> It's all the same from fucking 18 to fucking 40 to fucking 90 . . . . Every bitch is the same . . . .You're all fucking cunts. Every last one of you, you're cunts. You have no self-respect. You don't value anyone's time. You don't do anything. . . . I'm fucking sick of these fucking sluts. I'm done.

ECF 22 ¶ 4. In another podcast, the Defendant discussed two victims, referring to them and others as "cunts," and stating they would "rot in motherfucking hell." ECF 22 ¶ 72. Like the Defendant's social media posts, the Defendant's podcast episodes often included victims' names and personal details about the victims. The Defendant often bragged about his podcast gaining popularity, at one point posting on social media that he had garnered nearly 20,000 "streams" and downloads of his podcast.




*Publicly posted Instagram "story" from the Defendant's Instagram account.*

While the victims experienced fear, anxiety, and stress, the Defendant enjoyed his newfound "popularity" and believed he had achieved status as a social media "influencer." ECF 22 ¶ 2.

b. <u>The Defendant's conduct is aggravated by the Defendant's disregard for Court orders and law enforcement directives.</u>

The Defendant's conduct is further aggravated by his flagrant disregard for court orders. The Defendant's lack of concern with the "judicial ramifications of his actions" is an important factor that supports the Government's request for a substantial upward variance. *See United States v. Marsico*, No. 24-3096, 2025 WL 3251776, at *2 (3d Cir. Nov. 21, 2025) (affirming upward variance where Judge Bissoon found, *inter alia*, that Defendant "had not been deterred—whether

by the victim's documentation of his abuse, by the police action, by the PFAs, or even by the threat of criminal liability and 'seem[ed] to be unconcerned with the judicial ramifications of his actions.'"). In this case, two victims applied for and were granted PFA orders against the Defendant in the Allegheny County Court of Common Pleas. PSIR ¶¶ 37, 49. When Person 1 obtained a PFA against the Defendant, the Defendant responded by publishing a podcast about Person 1 "calling her lewd names [and] making threats." PSIR ¶ 37. The Defendant also called Person 1's employer and went to her place of employment while the PFA was in effect. PSIR ¶ 37. Similarly, when Person 3 obtained a PFA against the Defendant, the Defendant posted a prior podcast referring to Person 3. PSIR ¶ 49; ECF 22 ¶ 55. The Defendant has also consistently exhibited a lack of respect for law enforcement officers who responded to incidents involving the Defendant. The Government intends to introduce exhibits at sentencing that will illustrate the Defendant's contempt for law enforcement, particularly female officers.

c. The Defendant's conduct is aggravated by the significant impact of his crimes on the victims in this case.

Finally, and perhaps most importantly, the Defendant's conduct has profoundly impacted the victims in this case. Victims of cyberstalking often experience the following:

> Several emotional and physical symptoms have been reported by victims of cyberstalking . . . . [T]he impact of cyberstalking ranged from distress, shame, and panic to anxiety, to self-harm and attempted suicide . . . . Other research indicates that because of the persistence of cyberstalking perpetrators, victims often report feeling powerless and socially isolated. Some victims of cyberstalking change their lifestyle as a response to being victimized and some will change their address, phone number, and/or email address.

Wendy A. Walsh, et al., *Characteristics and Dynamics of Cyberstalking Victimization Among Juveniles and Young Adults*, 31 VIOLENCE AGAINST WOMEN 1306, 1309 (2025) (internal citations omitted). As evidenced by the facts of this case, "[c]yberstalking "aims to humiliate, control, frighten, manipulate, embarrass, get revenge at, or otherwise harm the victim." Vasiu & Vasiu,

*supra*, at 42 (internal quotations omitted). Courts in the United States have acknowledged the significant impact these types of crimes have on victims – they induce fear and disrupt victims' daily lives and sense of safety. *See, e.g.*, *United States v. Wilson-Bey*, No. 2:21-cr-00306-GMN-NJK, 2022 WL 1217188, at *4 (D. Nev. Apr. 25, 2022) ("even if Defendant would not necessarily seek to physically harm her victims, physical harm is not the only kind of harm that detention protects against. . . . Defendant can still harm her victims by harassing [and] threatening . . . which can be done easily by phone or internet"); *United States v. Capriotti*, No. 21-cr-16, 2021 WL 229660, at *5 (N.D. Ill. Jan. 22, 2021) ("Threats, particularly those as explicit, graphic, and repeated as those alleged in this case, harm people. They terrorize people. They affect the safety, security and well-being of people. They induce fear.").

As detailed in the victim impact statements submitted to the Court, the Defendant demeaned, humiliated, and terrorized the victims in this case. The victims experienced extreme fear, distress, and hypervigilance as these events occurred. They changed their daily routines and habits due to the Defendant's incessant harassment. They sought protection from the police and the courts. All the while, the Defendant boasted about his increasing popularity online and refused to engage in the mental health treatment that was readily available to him. The effects of the Defendant's conduct did not end with his federal prosecution. The victims now experience the stress and anxiety of the Defendant's eventual and inevitable release from incarceration.

The Defendant may try to minimize his conduct by arguing it did not involve physical harm or violence, but the harm in this case is significant. *See* Vasiu & Vasiu, *supra*, at 43-44 ("Even though cyberstalking does not involve physical contact with the victim, it can nevertheless severely torment a victim. As numerous cases show, the victims of stalking commonly experience serious psychological harm, which 'often results in the victim experiencing post-traumatic stress disorder,

anxiety, sleeplessness, and sometimes, suicidal ideations.'"). The Defendant's sentence must reflect the serious and and long-lasting harm he has caused.

d. <u>The Defendant's characteristics and history.</u>

With respect to Defendant's characteristics and history, the PSIR details the Defendant's upbringing, educational background, and work history. PSIR ¶¶ 122-137. The Defendant has lived a privileged life with significant familial and social support. These factors weigh in favor of the Government's position as to sentencing in this matter. The Defendant did not engage in his criminal conduct due to unfortunate circumstances such as financial struggles, addiction to substances, or lack of access to mental health treatment. The Defendant stalked, harassed, and threatened the victims for reasons known only to the Defendant. The Defendant has conformed his conduct to the law for most of his life. From May to November 2025, he chose not to.

Given the nature and circumstances of the offenses and the characteristics and history of the Defendant, this Court should vary upward from the advisory guidelines and sentence the Defendant to a significant period of incarceration followed by a term of supervised release.

***2. 18 U.S.C. § 3553(a)(2)(A) – The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law and to Provide Just Punishment for the Offense.***

The Defendant stalked, harassed, and threatened eleven (11) victims during a seven (7) month time frame. He broadcast most of his conduct on various social media platforms to further humiliate the victims. When the victims tried to stop the Defendant, he escalated his disturbing behavior. Simply put, the Defendant's offenses were serious and have had a profound, lasting impact on the victims. This Court's sentence should reflect the gravity of the Defendant's offenses, especially given the drastic increase in the prevalence of these offenses nationwide. This Court's sentence should demonstrate that stalking, threatening, and harassing conduct is unacceptable in

our community and will be met with severe consequences.

***3. 18 U.S.C. § 3553(a)(2)(B), (C) – The Need for the Sentence Imposed to Afford Adequate Deterrence to Criminal Conduct and to Protect the Public from Further Crimes of the Defendant.***

The Defendant's conduct has received local, national, and even international attention.[1] While the Defendant's conduct has garnered significant media coverage, it is not rare. The Defendant's conduct is reflective of a nationwide increase in this type of victimization. *See* Vasiu & Vasiu, *supra*, at 41-42 ("[t]echnological advances have significantly expanded the opportunities for criminal behavior with respect to content-related offenses, such as cyberthreats . . . [and] stalking"). Given the pervasiveness of these offenses, the need to deter any such conduct in the future requires a sentence that includes a significant period of incarceration. A lesser sentence would not achieve this objective.

With respect to the need to protect the public from further crimes of the Defendant, the impact of this crime on society is serious, and the impact of the punishment on the Defendant ought to be equally serious. The Defendant has demonstrated a history of disturbing behavior directed towards the victims in this case and poses a danger to the community, particularly women. The Government submits that a significant period of incarceration followed by a term of supervised release affords adequate protection to the public from further crimes by the Defendant.

***4. 18 U.S.C. § 3553(a)(2)(D) – The Need to Provide the Defendant with Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner.***

---

[1] *See, e.g.,* Paula Reed Ward, *Whitehall Man Pleads Guilty to Stalking 11 Women Online, in Person*, TRIBLIVE (March 19, 2026); Miles Klee, *He Was Indicted for Cyberstalking. His Former Friends Tracked His ChatGPT Meltdown*, ROLLING STONE (January 14, 2026), https://www.rollingstone.com/culture/culture-features/chatgpt-ai-cyberstalking-social-media-1235496884/; Luke Chinman*, Influencer Faces Up to 70 Years in Prison, $3.5 Million Fine for Allegedly Stalking and Harassing 11 Women*, PEOPLE MAGAZINE (December 3, 2025, 4:17 PM), https://people.com/influencer-faces-70-years-in-prison-for-allegedly-stalking-women-11861247.

The Government does not view this factor as particularly relevant in this case.

***5. 18 U.S.C. § 3553(a)(3), (4) – The Kinds of Sentence and the Sentencing Range Established by the Applicable Category of Offense Committed by the Applicable Category of Defendant as Set Forth in the Guidelines.***

The advisory guideline range applicable to the Defendant is 41 to 51 months of incarceration. This range, however, does not adequately reflect the severity of the Defendant's offenses, particularly as it relates to the number of victims in this case. *See United States v. Leach*, 89 F.4th 189, 197–98 (1st Cir. 2023) ("the degree of severity of the harm caused to the appellant's victims . . . is not accounted for either by the sentencing guidelines or by the relevant cyberstalking and extortion statutes"). Had the Defendant only been charged with the offense against Person 1 at Count One, the Defendant's applicable guidelines after acceptance of responsibility would call for 24 to 30 months of incarceration.[2] An upward variance is necessary to reflect the number of victims who have each suffered separate and distinct harm inflicted by the Defendant.

***6. 18 U.S.C. § 3553(a)(5) – Any Pertinent Policy Statement.***

There are no pertinent policy statements applicable.

***7. 18 U.S.C. § 3553(a)(6) – The Need to Avoid Unwarranted Sentence Disparities Among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct.***

The Government's requested upward variance would not cause unwarranted disparities among defendants with similar records who have been found guilty of similar conduct. Courts have upheld upward variances where a defendant's conduct was particularly egregious, as is the case here. *See Leach*, 89 F.4th at 198–99 (upholding an upward variance where "several aspects of the [the

---

[2] Standing alone, Count One carries an offense level of 20 pursuant to Section 2A6.2(a) and Section 2A6.2(b)(1)(A) of the guidelines. With acceptance of responsibility, the Defendant's offense level would decrease to 17 pursuant to Section 3E1.1(b). Given the Defendant's criminal history category of I, his guideline range at Count One alone would be 24-30 months.

defendant's] conduct were especially egregious" and "distinguish[ed] [the defendant's] case from the mine-run of cyberstalking cases."); *Marsico*, 2025 WL 3251776, at *1 (upholding Judge Bissoon's imposition of an upward variance where the Court found the defendant's "yearslong campaign of cyberstalking [one victim]. . . 'beyond egregious.'"); *United States v. Lloyd*, 809 F. App'x 750, 752-56 (11th Cir. 2020) (upholding imposition of an above-guideline, statutory maximum sentence for cyberstalking where the defendant's conduct was sexually predatory and involved a 15-year-old girl). Given the number of victims and the impact of the Defendant's crimes on the victims, the Defendant's case falls into the category of egregious cases that warrant a substantial upward variance.

***8. 18 U.S.C. § 3553(a)(7) – The Need to Provide Restitution to Any Victims of the Offense.***

As of the date of the filing of this memorandum, no victims have sought restitution. Therefore, the Government is not seeking restitution at this time.

## III. Conclusion

The Defendant engaged in conduct that cannot be tolerated in our community. The Defendant's conduct was egregious, harmful, and will continue to affect the victims long after the Defendant is inevitably released from prison. In order to punish the Defendant for his crimes, ensure the safety of the community, and deter others from committing crimes like the Defendant's, a significant period of imprisonment followed by a term of supervised release is warranted. The Government therefore respectfully requests that this Honorable Court vary upward from the advisory guidelines range in this case and impose a sentence that includes a significant period of incarceration followed by a term of supervised release.

Respectfully submitted,

TROY RIVETTI
United States Attorney

*s/Hillary M. Weaver*
HILLARY M. WEAVER
Assistant United States Attorney
Hillary.Weaver@usdoj.gov
PA ID No. 322545